# EXHIBIT 3

ACCO,(MAAx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:20-cv-03603-GW-MAA

Outlet Tile Center v. JPMorgan Chase and Co. et al
Assigned to: Judge George H. Wu
Referred to: Magistrate Judge Maria A. Audero
Cause: 28:1332 Diversity-Other Contract

Date Filed: 04/20/2020
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Outlet Tile Center**
*a California Sole Proprietorship*

represented by **Robert Tauler**
Tauler Smith LLP
626 Wilshire Boulevard Suite 510
Los Angeles, CA 90017
310-590-3927
Fax: 424-750-5100
Email: rtauler@taulersmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**JPMorgan Chase and Co.**
*a Delaware Corporation*

**Defendant**

**United States of America**
*TERMINATED: 04/28/2020*

**Defendant**

**Does**
*1 through 10, inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/20/2020 | 1 | COMPLAINT Receipt No: ACACDC-26144898 - Fee: $400, filed by Plaintiff Outlet Tile Center, a California Sole Proprietorship. (Attachments: # 1 Exhibit A to Complaint, # 2 Exhibit B to Complaint) (Attorney Robert Tauler added to party Outlet Tile Center, a California Sole Proprietorship(pty:pla))(Tauler, Robert) (Entered: 04/20/2020) |
| 04/20/2020 | 2 | CIVIL COVER SHEET filed by Plaintiff Outlet Tile Center, a California Sole Proprietorship. (Tauler, Robert) (Entered: 04/20/2020) |
| 04/21/2020 | 3 | NOTICE OF ASSIGNMENT to District Judge George H. Wu and Magistrate Judge Maria A. Audero. (et) (Entered: 04/21/2020) |

| | | |
|---|---|---|
| 04/21/2020 | 4 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (et) (Entered: 04/21/2020) |
| 04/21/2020 | 5 | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: Complaint (Attorney Civil Case Opening) 1 . The following error(s) was found: No Notice of Interested Parties has been filed. A Notice of Interested Parties must be filed with every partys first appearance. See Local Rule 7.1-1. Counsel must file a Notice of Interested Parties immediately. Failure to do so may be addressed by judicial action, including sanctions. See Local Rule 83-7. (et) (Entered: 04/21/2020) |
| 04/21/2020 | 6 | NOTICE of Interested Parties filed by Plaintiff Outlet Tile Center, identifying Roberto Gutierrez. (Tauler, Robert) (Entered: 04/21/2020) |
| 04/22/2020 | 7 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 1 filed by Plaintiff Outlet Tile Center. (Attachments: # 1 Proposed Summons)(Tauler, Robert) (Entered: 04/22/2020) |
| 04/23/2020 | 8 | 60 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to defendant United States of America. (mrgo) (Entered: 04/23/2020) |
| 04/23/2020 | 9 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to defendant JPMorgan Chase and Co.. (mrgo) (Entered: 04/23/2020) |
| 04/23/2020 | 10 | APPLICATION for Temporary Restraining Order as to Defendants' loan program structuring filed by Plaintiff Outlet Tile Center. Application set for hearing on 4/27/2020 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Declaration of Robert Tauler in Support of Application, # 2 Declaration of Roberto Gutierrez in Support of Application, # 3 Proposed Order) (Tauler, Robert) (Entered: 04/23/2020) |
| 04/23/2020 | 11 | STANDING ORDER RE FINAL PRE-TRIAL CONFERENCES FOR CIVIL JURY TRIALS BEFORE JUDGE GEORGE H. WU. (SEE DOCUMENT FOR FURTHER DETAILS) (mrgo) (Entered: 04/23/2020) |
| 04/23/2020 | 12 | MINUTES (IN CHAMBERS) by Judge George H. Wu: denying 10 EX PARTE APPLICATION for TRO. (jag) (Entered: 04/23/2020) |
| 04/28/2020 | 13 | NOTICE OF DISMISSAL filed by Plaintiff Outlet Tile Center pursuant to FRCP 41a(1) as to United States of America. (Tauler, Robert) (Entered: 04/28/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/29/2020 11:02:28 | | | |
| **PACER Login:** | barbaragilles9 | **Client Code:** | 07555-0004 |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-03603-GW-MAA End date: 4/29/2020 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Robert Tauler (CA SBN 241964)
Tauler Smith LLP
626 Wilshire Blvd., Suite 510
Los Angeles, California 90017
Tel: (310) 590-3927
Email: rtauler@taulersmith.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OUTLET TILE CENTER, a California Sole Proprietorship;<br><br>Plaintiff,<br><br>vs.<br><br>JPMORGAN CHASE & CO., a Delaware Corporation; UNITED STATES OF AMERICA; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:20-cv-03603<br><br>**COLLECTIVE ACTION**<br><br>**COMPLAINT**<br><br>**[DEMAND FOR A JURY TRIAL]** |

Plaintiffs Outlet Tile Center, individually and on behalf of all other similarly situated ("Plaintiffs"), allege the following against Defendants JPMorgan Chase & Co., a Delaware Corporation, the United States of America, and Does 1 through 10, inclusive (collectively, "Defendants"), and in support thereof, avers as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action because the parties are citizens of different states and the controversy exceeds the value of $75,000.

2. This Court has personal jurisdiction over Defendants because they transact a substantial amount of business in this state.

3. Venue is proper in this judicial district because a substantial amount of the transactions at issue occurred in this district.

## PARTIES

4. Plaintiff Outlet Tile Center, is a California sole proprietorship, which operates in this district.

5. Defendant JPMorgan Chase & Co. ("Chase") is a Delaware Corporation, whose primary place of business is 270 Park Avenue, New York, New York 10017.

6. Defendant Small Business Administration ("SBA"), named herein as the United States of America, is a government agency who has waived sovereign immunity under 28 U.S.C. § 1346(b).

7. Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-10, inclusive, and therefore sued these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the aforementioned defendants.

## FACTUAL ALLEGATIONS

8. On March 27, 2020, the President of the United States signed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) (Pub. L. 116–136) into law, providing relief to the stock market, banks, and ostensibly to small businesses. However, while the government can, on a moment's notice, create and distribute money to prop up capital markets and large banking institutions through the federal reserve, no such mechanism exists to provide assistance to small businesses.

9. Thus, as part of the CARES Act, Congress appropriated over $340 billion in funds to the Small Business Administration ("SBA"), so that small businesses could obtain loans to cover payroll and avoid massive layoffs attendant to the COVID-19 crisis through existing programs which require banks to act as intermediaries. The $349 billion in aid is commonly known as the Payroll Protection Act ("PPP").

10. The CARES Act gave the SBA rulemaking authority as to the administration and distribution of PPP loans, and the SBA in turn promulgated a series of "Interim Final Rules" and other guidance on at least three occasions (April 2, April 9, and April 15) in order to get the appropriated funds to small business owners.

11. For its part, the SBA website describes PPP as a "loan designed to provide a direct incentive for small businesses to keep their workers on the payroll" and goes on to explain the favorable terms of the PPP as follows:

- SBA will forgive loans if all employees are kept on the payroll for eight weeks and the money is used for payroll, rent, mortgage interest, or utilities.
- The loan will be fully forgiven if the funds are used for payroll costs, interest on mortgages, rent, and utilities (due to likely high subscription, at least 75% of the forgiven amount must have been used for payroll).
- Loan payments will also be deferred for six months.
- No collateral or personal guarantees are required.
- Neither the government nor lenders will charge small businesses any fees.
- This loan has a maturity of 2 years and an interest rate of 1%.

12. On April 2, 2020 the SBA issued its "First PPP Interim Final Rule" acknowledging that Congress appropriated $349,000,000,000 for PPP to "provide relief to America's small businesses expeditiously" starting the next day, April 3, 2020 and that the funds would be available until June 30, 2020.

13. Amidst the lack of clear procedures for application, the SBA issued an additional guidance (the "Second PPP Interim Final Rule") on April 9, clarifying that lenders did not have any legal duty to verify the numbers provided by their clients. In other words, the banks had no obligation to verify whether or not the financial information they received from their clients was true or false.

14. On April 16, 2020, the SBA reported that the entirety of the 349 billion dollars appropriated had been disposed of, less than two weeks after their availability, and before many small business owners could even submit an application. ("Third PPP Interim Loan").

**The Government's Decision to Distribute Emergency PPP Loans Through SBA 7(a) Programs Discriminated Against Smaller Businesses**

15. The fair distribution of PPP loans to their intended recipients through the SBA was questionable from the outset. As an initial matter, the SBA is completely understaffed to administer a program as large as PPP. Typically, the SBA administers around $21 billion in small business loans for the entire year. PPP, however, requires the same SBA staff to administer loans in excess of 340 billion dollars – over sixteen times what the SBA typically loans in a year – in the span of less than two weeks.

16. Adding to personnel constraints, the PPP's administration through the SBA's loan program, which requires submission through a bank, made access to PPP all but impossible for smaller businesses. According to the chamber of commerce, 75-80% of small businesses are self-financed, and only 16% of businesses are funded by bank loans. Thus, by making a relationship with a lender a pre-requisite to access to PPP money, the government provided a clear advantage to larger and more sophisticated businesses that already had these relationships.

17. Figures produced by the SBA on April 13, 2020 (the "SBA Report") demonstrate just how unsuccessful the PPP loans have been in meeting the stated objective of helping small businesses. For example, the SBA Report states that 1,035,086 small business obtained loans, totaling $247,543,393,521. However, according to the SBA's own statistics, there are over 30.2 million small businesses in the United States. Thus, PPP has only served 3.2% of small businesses in the United States as of April 13.

18. The SBA Report also makes clear that the PPP money overwhelmingly benefitted larger businesses. According to the SBA Report, the average PPP loan amount as of April 13 was $239,152.49, meaning that the average business approved for a PPP loan amount had a payroll of $95,660.996 per month, and $1,147,931.95 per year. However, data from private groups show that nearly 40% of small businesses have less than $100,000 in total revenue per year. Rather than helping smaller businesses, PPP has only exacerbated the existing divide between the haves and the have-nots.

19. Most shocking of all, however, is how banks capitalized on the compensation structure created by the government. According to 13 CFR 120 III(3)(d), the SBA pays banks a 5% commission on loans it submits under $350,000 and 3% of loans between $350,000 and $2,000,000. The CFR itself calls this "a substantial processing fee."[1]

20. Since the amount of work to prepare a smaller loan is the same as that for a larger loan, the banks have a clear incentive to solicit and submit loans for larger businesses. For example, lenders make an unconscionable $60,000 for generating a $2,000,000 loan for a larger business, but would only stand to make $2,500 on a $50,000 loan to a smaller business. This incentive structure is made worse by the fact that the banks do not have any obligation to verify any of the applications they submit for fraud. 13 C.F.R. 120 III(1).

---

[1] 13 CFR 120 III(1)(i) also explains that this "substantial processing fee" is made sweeter by the fact that the banks will also make money on interest and carry no risk, since the loans are guaranteed by the government.

4
COMPLAINT

21. Given the incentive structure detailed above, it should be no surprise that over 40% of PPP funds went to businesses that borrowed over $350,000. Banks made over $3 billion in fees ($3,077,114,585.25) from the government on PPP loans in the $350,000 to $2,000,000 range, an average of <u>$23,023.86</u> for each application, which again, does not require any independent verification from banks.

22. Without relief from the Court, the economy will suffer calamitous results in a very short time-frame. The small businesses that comprise 99.9% of American businesses will be forced to lay off many of the 58.9 million people they employ, who will in turn are primed to rely on high interest rate credit cards administered by the very same banks that profited from the current PPP disaster.

### **Defendant Chase**

23. Defendant Chase is the largest bank in the United States with over $2 trillion in assets and over 25 million customers, including businesses large and small.

24. On April 2, 2020, the SBA announced that it would begin accepting PPP Applications on April 3, 2020.

25. The same day, April 2, Chase, emailed customers to say the company "will most likely not be able to start accepting applications on Friday, April 3rd as we had hoped."

26. On April 4, Chase published on its website a document titled "Small Business Owners: CARES Act FAQ ("April 4 Representations"), which has subsequently been removed from Chase's website. (Exhibit A.)

27. The April 4 Representations unambiguously stated that Chase would process PPP loans on a "first come, first served" basis, consistent with the CFRs published by the SBA. However, this representation was false. In fact, Chase solicited PPP loan applications personally from its best clients before it made applications available to small business clients.

28. This is evident from representations made by Chase's leadership. For example, on Tuesday, April 7, at JPMorgan COO Gordon Smith, on a phone call with

President Trump, said that as of 1:00 p.m. on Tuesday April 7, JPMorgan had received 375,000 requests to apply for some $40 billion in PPP loans.

29. However, Chase did not announce the opening of its online portal until April 7, (the "April 7th Solicitations"), and did not email clients regarding the opening of its online portal until April 7 at 4:35p.m. By this time, Chase had already solicited and submitted applications from its best clients, and knew, or should have known, that it would not process any clients through the online portal at all.

30. Instead, Chase strung small business owners along and told them that their application was "received" minutes after they were submitted (the "Loan Confirmation Representations"), but Chase never handed over the paperwork to the SBA. Chase callously ignored or openly lied to hundreds of thousands of their small business customers from April 7 through April 16, who inquired on the status of their doomed applications.

31. On April 16, the SBA announced it had run out of PPP money, and on April 17, Chase emailed its customers saying Chase was "doing all they can to have your application ready" and that Chase's customers should continue to wait because Chase was "continuing to work our existing queue of applications" (the "April 17 Representations"). This statement was also false.

32. On the very same day, April 17, Chase issued a press release misleadingly stating that "Chase has secured more funding for small businesses than anyone else in the industry" announcing that it had disbursed $14 billion in loans. Chase failed to announce that, according to a report from the SBA dated April 17, 2020 (which conspicuously identifies Chase as "Lender 1"), the average approved loan for Chase was $515,304. (Exhibit B.) This means that the average loan Chase processed was for businesses that had over $2,437,429 in yearly payroll costs, twice as much as the average PPP loan, which was already well above the needs of the average small business.

33. Chase made over $700 million in two weeks by servicing its wealthy clients' PPP loans, all the while taking no risk and having absolutely zero regard for small businesses in their time of need.

34. Chase purposely lied to its small business clients, who believed that Chase would process loans on a "first come, first served" basis. Needless to say, had Chase small business customers known that Chase online portal was a total sham, they would have sought PPP loans elsewhere. Instead, hundreds of thousands of small businesses have been irreparably harmed at the hands of Chase.

## Plaintiff Outlet Tile Center

35. Plaintiff Outlet Tile Center has six employees and has been banking with Chase for decades.

36. Outlet Tile Center is in the business of providing flooring for homes and businesses.

37. On April 9, Outlet Tile Center applied through Chase's online business account portal and was provided a loan application reference number, indicating that its application was received.

38. On April 17, Outlet Tile Center received an email from Chase saying all PPP funds had been exhausted.

## CLASS ALLEGATIONS

39. Each Plaintiff viewed and relied on the April 4th Representations, the April 7th Solicitations, the Loan Confirmation Representations, and the April 17th Representations ("the False Representations").

40. Each Plaintiff has been damaged by Chase's misrepresentations because Chase never applied for PPP funds on their behalf. Had Plaintiff's known that Chase never intended to take action on their behalf, Plaintiffs would have applied for PPP funds from other lenders.

41. Each Plaintiff has also been harmed because in reliance on Chase's False Representations, it did not attempt to obtain PPP funds from another bank.

42. Each Plaintiff has also been harmed because they face the specter of firing one or more of their employees.

43. In addition to the equitable remedies detailed below, Plaintiffs seek class certification for equitable and injunctive relief under Rule 23(b)(2) that:

(1) Chase be enjoined from further participation in the PPP due to its abuse of the program rules, CFR's, and misrepresentations to its customers;

(2) Chase return all of its commissions from PPP to the federal treasury and publish an accounting of the beneficiaries of their PPP loans;

(3) All qualifying small businesses who applied to Chase for PPP funding on or before April 16 be granted a loan by the SBA on the terms announced by Chase in the April 4 Representations.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Promissory Estoppel)**

**(Against Chase)**

44. Plaintiffs incorporate the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

45. Defendant Chase represented that its loans would be processed on a "First Come Basis" in its April 4 Representations, that Plaintiffs could obtain funding through their online portal in its April 7th Solicitations, and that Plaintiffs' loans were being processed in the Loan Confirmation Representations. These representations were false when made.

46. Plaintiffs relied on the April 4 Representations, the April 7 Solicitations, and the Loan Confirmation Representations and on the basis of these representations did not seek to obtain a PPP loan from any other source until it became widely known that the SBA had run out of funds for the PPP program on April 16.

47. Plaintiffs suffered damages as a result of their reliance on Chase's representations, because they now have not obtained funding on terms promised, and must finance their operations through other means or terminate employees.

48. Plaintiffs' reliance on Chase was reasonable, since neither the April 4 Representations, the April 7 Solicitations, nor the Loan Confirmation Representations indicated in any way that Chase was giving preferential treatment to its larger clients.

## SECOND CLAIM FOR RELIEF

### (Equitable Relief)

### (Against All Defendants)

49. Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

50. The SBA violated the CARES Act by promulgating rules that were designed to benefit large companies and their bankers. Chase violated the spirit of the CARES Act, and the PPP, acting solely in its own interests at the expense of small business owners which the PPP was intended to benefit.

51. In order to advance its scheme to defraud the public, Chase made the False Representations to small business owners so it could enrich itself and its best clients in secret.

52. Chase's conduct has caused irreparable harm to Plaintiffs since Chase has made it so that they will not receive loans in a timely fashion, if at all.

53. If not enjoined, Plaintiffs will suffer future harm, since the April 17 Representations indicate that Chase intends to continue to string Plaintiffs along.

54. Chase has been also unjustly enriched by their conduct detailed above by purposely funneling PPP loans to less needy customers so that Chase would make more money in commissions and strengthen its relationships with larger clients.

55. Accordingly, Plaintiffs seeks an order:
- Enjoining Chase from further participation in PPP due to its abuse of the program rules, CFRs, and misrepresentations to its customers;

- That Chase disclose the amounts of each loan they processed under the PPP program on their website, along with the identities of the recipients of Chase funded loans;
- That the SBA adopt a commission structure consistent with the stated objectives of the CARES Act;
- Compelling the return all of all commissions Chase earned from PPP to the federal treasury; and
- That Chase fund Plaintiffs' loans on the terms made in the April 4 Representations.

56. Plaintiff also seeks a declaration that Chase knowingly misled its small business customers at the expense of its larger clients, and that Chase knew that its small business portal was a sham.

57. Plaintiff also seeks an accounting from Chase and the SBA of the 27,307 Chase PPP loans approved from April 3-April 17.

## THIRD CLAIM FOR RELIEF
### (Intentional Misrepresentation)
### (Against Chase)

58. Plaintiffs incorporate the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

59. The April 4 Representations, the April 7 Solicitations, the Loan Confirmation Representations, and the April 17 Representations ("the False Representations") were all false.

60. Chase knew the False Representations were false when made.

61. Plaintiffs were damaged by the False Representations as detailed above.

62. Defendant's conduct was a substantial factor in Plaintiff's harm.

63. Defendant's conduct was oppressive and malicious, entitling Plaintiff to punitive damages.

10
COMPLAINT

## FOURTH CLAIM FOR RELIEF

### (Interference with Contractual Relations)

### (Against Chase)

64. Plaintiffs incorporate the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

65. Chase interfered with Plaintiffs' contractual relationships with its employees by the False Representations.

66. Plaintiffs' contracts with its employees were in fact damaged by Chase's conduct, leading to damages that are not calculable at this time, but will be at trial.

67. Chase knew, or reasonable should have known that it's conduct would damage Plaintiff's contractual relationships with its employees.

68. Plaintiffs are entitled to punitive damages since Chase's conduct was willful, oppressive and fraudulent.

## FIFTH CLAIM FOR RELIEF

### (Unfair Business Practices)

### (Against Chase)

69. Plaintiffs incorporate the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

70. Chase's conduct was unfair and fraudulent under California Business and Professions Code § 17200.

71. Plaintiffs are consumers of Chase's services and have been directly harmed by Chase's conduct.

72. Plaintiff is entitled to injunctive relief and disgorgement of Chase's ill-gotten gains.

## PRAYER

Wherefore, Plaintiff prays for judgment against Defendants as follows:

1. For compensatory damages according to proof;
2. For restitution of Chase's ill-gotten gains;

3. For punitive damages;
4. For an injunction prohibiting Chase from further participation in PPP;
5. For an injunction stopping further funding of PPP until the SBA adopts a commission structure consistent with the CARES Act;
6. For an accounting from Chase and the SBA of the 27,307 Chase PPP loans approved from April 3-April 17 through Chase;
7. that said accounting be published on Chase's website, along with the identities of the recipients of Chase funded loans;
8. For a declaration under the Declaratory Judgment Act (28 USC § 2201) that Chase knowingly misled its small business customers at the expense of its larger cliens;
9. For an Order finding that Chase has been unjustly enriched and compelling the return all of all commissions Chase earned from PPP to the federal treasury;
10. For an Order that Chase fund Plaintiffs' loans on the terms made in the April 4 Representations under the Court's equitable powers;
11. For attorneys' fees under California Code of Civil Procedure § 1021.5;
12. For prejudgment interest;
13. For costs of suit;
14. For all other relief the Court deems appropriate.

DATED: April 20, 2020               TAULER SMITH LLP


                                    By:  */s/ Robert Tauler*
                                         Robert Tauler
                                         Attorneys for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury.

DATED: April 20, 2020         TAULER SMITH LLP


By:    */s/ Robert Tauler*
        Robert Tauler
        Attorneys for Plaintiffs