# EXHIBIT 6

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.2 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:20-cv-02523

Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A et al

Assigned to: Honorable Joan B. Gottschall

Demand: $5,000,000

Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 04/24/2020

Jury Demand: Plaintiff

Nature of Suit: 430 Banks and Banking

Jurisdiction: Federal Question

**Plaintiff**

**Sha-Poppin Gourmet Popcorn LLC**      represented by    **Ari Jonathan Scharg**
Edelson P.C.
350 N. LaSalle St.
14th Floor
Chicago, IL 60654
312 239 3362
Email: ascharg@edelson.com
*ATTORNEY TO BE NOTICED*

**Benjamin Harris Richman**
Edelson PC
350 North LaSalle Street
14th Floor
Chicago, IL 60654
(312) 589-6377
Email: brichman@edelson.com
*ATTORNEY TO BE NOTICED*

**Christopher Lillard Dore**
Edelson PC
350 North LaSalle Street
14th Floor
Chicago, IL 60654
(312) 572-7218
Email: cdore@edelson.com
*ATTORNEY TO BE NOTICED*

**Daniel Joshua Schneider**
Edelson PC
350 N Lasalle St 14th Floor
Chicago, IL 60654
(312) 589-6370
Email: dschneider@edelson.com
*ATTORNEY TO BE NOTICED*

**Jay Edelson**
Edelson PC
350 North LaSalle Street
14th Floor

Chicago, IL 60654
(312) 589-6375
Email: jedelson@edelson.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**JPMorgan Chase Bank, N.A**

**Defendant**

**RCSH Operations, LLC**

**Defendant**

**RCSH Operations, Inc.**

**Defendant**

**Phunware, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2020 | 8 | ORDER: Second Amended General Order 20-0012 IN RE: CORONAVIRUS COVID-19 PUBLIC EMERGENCY Signed by the Chief Judge Rebecca R. Pallmeyer on March 30, 2020. All open cases are impacted by this Second Amended General Order. Amended General Order 20-0012, entered on March 17, 2020, and General Order 20-0014, entered on March 20, 2020, are vacated and superseded by this Second Amended General. See attached Order for guidance. Signed by the Honorable Rebecca R. Pallmeyer on 3/30/2020: Mailed notice (rc, ) (Entered: 04/24/2020) |
| 04/24/2020 | 1 | COMPLAINT filed by Sha-Poppin Gourmet Popcorn LLC ; Jury Demand. Filing fee $ 400, receipt number 0752-16953157.(Edelson, Jay) (Entered: 04/24/2020) |
| 04/24/2020 | 2 | CIVIL Cover Sheet (Edelson, Jay) (Entered: 04/24/2020) |
| 04/24/2020 | 3 | ATTORNEY Appearance for Plaintiff Sha-Poppin Gourmet Popcorn LLC by Jay Edelson (Edelson, Jay) (Entered: 04/24/2020) |
| 04/24/2020 | 4 | ATTORNEY Appearance for Plaintiff Sha-Poppin Gourmet Popcorn LLC by Benjamin Harris Richman (Richman, Benjamin) (Entered: 04/24/2020) |
| 04/24/2020 | | CASE ASSIGNED to the Honorable Joan B. Gottschall. Designated as Magistrate Judge the Honorable Susan E. Cox. Case assignment: Random assignment. (acm, ) (Entered: 04/24/2020) |
| 04/24/2020 | 5 | ATTORNEY Appearance for Plaintiff Sha-Poppin Gourmet Popcorn LLC by Christopher Lillard Dore (Dore, Christopher) (Entered: 04/24/2020) |
| 04/24/2020 | 6 | ATTORNEY Appearance for Plaintiff Sha-Poppin Gourmet Popcorn LLC by Ari Jonathan Scharg (Scharg, Ari) (Entered: 04/24/2020) |
| 04/24/2020 | 7 | ATTORNEY Appearance for Plaintiff Sha-Poppin Gourmet Popcorn LLC by Daniel Joshua Schneider (Schneider, Daniel) (Entered: 04/24/2020) |
| 04/24/2020 | 10 | ORDER Third Amended General Order 20-0012 IN RE: CORONAVIRUS COVID-19 PUBLIC EMERGENCY Signed by the Chief Judge Rebecca R. Pallmeyer on April 24, 2020. All open cases are impacted by this Third Amended General Order. Parties are must |

| | | carefully review all obligations under this Order, including the requirement listed in paragraph number 5 to file a joint written status report in most civil cases. See attached Order. Signed by the Honorable Rebecca R. Pallmeyer on 4/24/2020: Mailed notice. (docket10, ) (Entered: 04/27/2020) |
|---|---|---|
| 04/27/2020 | | SUMMONS Issued as to Defendants JPMorgan Chase Bank, N.A, Phunware, Inc., RCSH Operations, Inc., RCSH Operations, LLC. (ng, ) (Entered: 04/27/2020) |
| 04/27/2020 | 9 | Entered in Error. (rc, ). (Entered: 04/27/2020) |
| 04/27/2020 | 11 | NOTICE of Correction (rc, ) (Entered: 04/27/2020) |
| 04/28/2020 | 12 | ORDER: An initial status report and, if appropriate, case management plan is due on or before June 29, 2020. The parties are directed to consult Judge Gottschall's website for specific requirements for all written status reports and for the discovery plans. In conformity with Third Amended General Order 20-12 and due to the need for social distancing during the COVID-19 pandemic, this court is ordering written status reports instead of routine oral status hearings. This includes initial status hearings and scheduling conferences under Fed. R. Civ. P. 16(b). See Judge Gottschall's website for the procedure for requesting a hearing. No Rule 26(f) discovery plan should be submitted until all defendants have been served. If all defendants have not been served by the deadline for filing an initial status report, the report should so state and propose a deadline for filing a discovery plan. The parties are directed to discuss settlement and whether they consent to proceed before the Magistrate Judge. They are further directed to meet and confer regarding a proposed discovery plan. See Judge Gottschall's civil case management packet regarding pretrial case management procedures at: http://www.ilnd.uscourts.gov. Signed by the Honorable Joan B. Gottschall on 4/28/2020. Mailed notice(mjc, ) (Entered: 04/28/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/29/2020 13:20:05 | | | |
| **PACER Login:** | barbaragilles9:4644320:3959055 | **Client Code:** | 07555-0004 |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-02523 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| SHA-POPPIN GOURMET POPCORN LLC, an Illinois limited liability company, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff,* | |
| *v.* | |
| JPMORGAN CHASE BANK, N.A., an Ohio corporation, and, | |
| RCSH OPERATIONS, LLC, Louisiana limited liability company, RCSH OPERATIONS, INC., a California corporation (together d/b/a Ruth's Chris Steak House), and PHUNWARE INC., a Delaware corporation, individually and on behalf of all others similarly situated, | |
| *Defendants.* | |

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Sha-Poppin Gourmet Popcorn LLC ("Sha-Poppin" or "Plaintiff") individually and on behalf of all others similarly situated, brings this Class Action Complaint and Demand for Jury Trial against Defendant JPMorgan Chase Bank, N.A ("Chase"), and separately, Defendants RCSH Operations, LLC, RCSH Operations, Inc. (together, "Ruth's Chris"), and Phunware, Inc. ("Phunware"), individually and on behalf of a Defendant Class, to obtain redress for Defendants' efforts to cheat Plaintiff and countless small businesses out of their right to apply for and receive federal stimulus funding in a moment of national crisis. Plaintiff alleges as follows upon personal knowledge as to itself and its own acts and experiences and, as to all other matters, upon information and belief.

## INTRODUCTION

1.      In the past two months, COVID-19 has destroyed national commerce and shuttered countless businesses across virtually all sectors. Responding to mass layoffs occurring around the country—with the threat of far more to come—Congress created a program that would quickly distribute money to small businesses like Plaintiff on a first-come, first-served basis. Time was of the essence.

2.      Defendant Chase is a multi-trillion dollar banking entity, highly sophisticated market actor, and hardly one willing to let a crisis go to waste.

3.      Congress' plan to aid small businesses was enacted into law on March 27, 2020. In its initial form, the Small Business Administration's ("SBA") Paycheck Protection Program ("PPP") authorized up to $349 billion in forgivable loans to small businesses to cover payroll and other expenses. This money was meant to provide a critical and immediate life raft to businesses who have been shut down pursuant to their state's "stay at home" order, or have been effectively shuttered due to a dramatic drop-off in business.

4.      Speed and straightforwardness were to be the hallmarks of the PPP. Small businesses and sole proprietorships were to be able to apply through SBA-approved lenders as soon as the application window opened, get in line, and wait their turn to be approved.

5.      Chase, however, saw an opportunity to help its established and better-heeled clients by helping them break a rule ingrained in virtually all Americans since pre-school: no line-cutting.

6.      As the federal government was ramping up to allow small businesses to apply for PPP loans, Chase decided to ensure that its favored clients would be provided special assistance to make sure their loan applications were submitted quickly, accurately, and without a hitch.

Everyone else, meanwhile, would have to try to submit an application through a non-functional web portal—or look elsewhere.

7.      Plaintiff, a customer of Chase's Business Banking platform, is a small Illinois-based popcorn seller without the clout and resources of Chase's favored clients. Due to Chase's prioritizing of its favored customers over Plaintiff—and countless other businesses like it—Plaintiff was impeded in applying for a PPP loan through Chase, at one point implicitly encouraged to seek a loan elsewhere, and ultimately, received a far smaller loan than it would have otherwise received if Chase had allowed it to apply on April 3, 2020 (as it tried to do).

8.      As a result, Plaintiff is now on the brink as it desperately tries to keep its employees on. Such is the case with so many other businesses who were put in harm's way by Chase's pampering of its prized clients such as Defendants Ruth's Chris and Phunware, and other national operations with billions of dollars in combined revenue that are members of the Defendant Class, such as Shake Shack, MannKind, and Potbelly. Many of these companies received millions, and in some cases, $10 million or more from Defendant Chase through its preferred client approval process. Defendant Phunware is a multi-million vendor for the President's re-election campaign that named a former JPMorgan Chase as its corporate board chair on March 30, 2020—just one day after the PPP program was passed by Congress—and received PPP funding within 2 days of its April 8 application.

9.      All the while, approximately 6% of Chase's 300,000 Business Banking customers that tried to apply for PPP loans through cases were successful, while nearly 100% of Chase's Commercial Banking clients were approved.

10.     Despite knowing its intentional stalling tactics would inevitably leave many businesses' applications unprocessed, untimely submitted, or gratuitously delayed as time was

quickly running out, Chase concealed its practices from Plaintiff. It did so knowingly, out of a combination of elite favoritism and, to be sure, at least some additional profit.

11.     As a direct result of Chase's and the Defendant Class' acts and omissions, Plaintiff and countless small businesses have lost out on their ability to apply for PPP loans, or received far smaller loans than they otherwise would have. As such, Plaintiff brings this Class Action Complaint in order to vindicate its rights, and those of small businesses everywhere who are similarly situated, and to hold Defendants accountable.

## PARTIES

12.     Plaintiff Sha-Poppin is a limited liability company formed under the laws of the State of Illinois, with its principal place of business in Illinois, and whose management resides in Illinois—as such, it is a citizen of Illinois.

13.     Defendant JPMorgan Chase Bank, N.A., is a company and subsidiary of JPMorgan Chase & Co., with its principal place of business located at 1111 Polaris Parkway, Columbus, Ohio 43240. Chase conducts substantial business throughout this District and the State of Illinois, and throughout the United States.

14.     Defendant RCSH Operations, LLC is a Louisiana limited liability company, with its principal place of business located at 1030 West Canton Avenue, Suite 100, Winter Park, Florida 32789. Defendant RCSH Operations, LLC conducts substantial business throughout this District and the State of Illinois, and throughout the United States.

15.     Defendant RCSH Operations, Inc., is a California corporation, with its principal place of business located at 1030 West Canton Avenue, Suite 100, Winter Park, Florida 32789. Defendant RCSH Operations, Inc. conducts substantial business throughout this District and the State of Illinois, and throughout the United States.

16.     Defendant Phunware, Inc. is a Delaware corporation with its principal place of business located at 7800 Shoal Creek Bouvard, Suite 230-S, Austin, Texas 78757. Defendant Phunware conducts substantial business throughout this District and the State of Illinois, and throughout the United States. Phunware is a digital technology company that specializes in the mass collection of smartphone location data and is actively working for President Donald Trump's re-election campaign.

### JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) because, as to all proposed Classes and Subclasses, (a) at least one member of the Class, which consists of at least 100 members, is a citizen of a different state than Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

18.     This Court has personal jurisdiction over Defendant Chase because it conducts significant business in this State, including establishing consumer and business contracts here, because a substantial amount of the conduct giving rise to this action occurred in this State, and because Defendant Chase withheld material information from Plaintiff (and other entities in this State) when it had a duty to speak.

19.     This Court has personal jurisdiction over Defendants RCSH Operations, LLC, RCSH Operations, Inc., and Phunware, Inc. because they conduct significant business in this State, including establishing consumer and business contracts here, because at least some of their conduct giving rise to this action occurred in and/or was directed at this state, including, but not limited to, to the extent that any individuals and/or entities including and/or affiliated with Defendants received PPP loan funds after applying for a loan through Chase.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial

part of the events and omissions giving rise to Plaintiff's claims occurred in and/or emanated

from this District.

## FACTUAL BACKGROUND

**I.     Congress Establishes the PPP to Quickly Provide Struggling Businesses a Lifeline.**

21.     On March 11, 2020, the COVID-19 outbreak—which had first been identified

several months prior—was designated as a pandemic by the World Health Organization (WHO).

President Trump followed suit on March 13, 2020, declaring the pandemic of sufficient severity

to warrant an emergency declaration for all States, territories, and the District of Columbia.

22.     Shortly thereafter, Governors from states across the nation began to publicly

announce an escalating series of various "stay at home" orders that limited public gatherings,

deemed certain business sectors "essential," mandated the partial or complete closure of normal

business operations for businesses not deemed "essential," and placed stringent requirements on

many businesses deemed "essential" in order for them to continue operating.

23.     This economic fallout from COVID-19, and the national response to it, was

immediate and enormous. Countless businesses in "stay at home" order states across the nation

were forced by law to overhaul their business models, scale back their business dramatically, or

shutter—either temporarily or permanently. Foot traffic in all businesses also took a sharp

downturn as the public began to avoid public spaces of all types, further harming businesses'

ability to stay afloat. Furloughs and layoffs were rampant in the private sector. Unemployment

insurance filings reached record levels. The major stock indices plummeted, erasing trillions of

dollars in shareholder value and retirement accounts.

24.     The federal government faced overwhelming public pressure to respond to this national economic disaster, with the knowledge that time was of the essence to prevent further disruption and destruction—particularly among small businesses. As such, on March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") into law.

25.     To say this legislation was unprecedented is, frankly, an understatement. Amounting to approximately $2 trillion, it is the single-largest economic stimulus bill in American history, underscoring the scope of the threat Congress believed it was facing—and the importance of dramatic, immediate action to put money in the pockets of people and businesses.

26.     Critically, the CARES Act created a $349 billion loan program for businesses with fewer than five hundred employees: the PPP. The goal of the PPP was to provide American small businesses with eight weeks' worth of funds to assist in covering payroll, rent, and benefits, through fully federally guaranteed loans administered by the SBA.[1]

27.     Really, PPP loans operate more like grants if the recipient is able to follow certain rules, including that at least 75 percent of the loan goes toward payroll, and that salaries and wages of employees making under $100,000 in the past year are not decreased more than 25 percent.[2] Businesses that follow these rules are permitted to submit a request to their SBA lender servicing the loan for total forgiveness—otherwise, the loan matures in two years and carries a 1 percent interest rate.[3]

---

[1]     Small Bus. Admin., Docket No. SBA-2020-0015, 13 CFR Part 120, Paycheck Protection Program 3245–AH34, Interim Final Rule, 85 Fed. Reg. 20814 § (2)(o) (Apr. 15, 2020).

[2]     85 Fed. Reg. 20812 § e; *id.* at 20813 § (2)(o).

[3]     *Id.* at 20813 § (2)(j).

28.     The SBA was charged with creating the PPP implementing regulations. It issued

the first interim final rule ("Initial Rule") on April 2, 2020, and the window for businesses to

begin applying for PPP loans was to open with all SBA-affiliated lenders on April 3, 2020.

29.     A key piece of the PPP was that applications be opened and funds be distributed

on a "first-come, first-served" basis—that is, SBA's was to process applications and distribute

funds based on the order in which they were received.[4] This made the SBA's list of approved

lenders key gatekeepers in this process, by extension, as they certainly understood. Because the

PPP was to be administered *only* through SBA-approved lenders, and because applicants could

*only* access funds from the single pot of $349 billion allocated for the program (unless it was

replenished), applying for a loan through an SBA-approved lender quickly and properly would

be critical, and the lenders would have to play a role in ensuring that applications were fairly

processed in the order that they were received, to the extent feasible.[5]

30.     The PPP contains other limitations, as well. For instance, each business applicant

may only receive one loan through the PPP. Thus, "if you apply for a PPP loan you should

consider applying for the maximum amount," per the Final Interim Rule.[6] This strongly

incentivized applicants to do precisely this, and to put their hopes in being awarded their full

loan request before the PPP loan fund ran dry.

31.     Knowing that SBA-affiliated lenders would face a crush of applications for PPP

loans, Congress added a juicy carrot to the stick: for each loan processed and approved, the bank

---

[4]     *Id.* at 20813 § (2)(m); *see also* https://home.treasury.gov/system/files/136/PPP--
IFRN%20FINAL.pdf.

[5]     85 Fed. Reg. 20815 § (3)(a) ("Who is eligible to make PPP loans?", then listing the
categories of lender eligible to make PPP loans).

[6]     *Id.* at 20813 § (2)(k).

would receive an origination fee of 5 percent on loans up to $350,000; 3 percent on loans

between $350,000 and $2 million; and 1 percent on loans between $2 million and $10 million.[7]

## II.      Chase Works Behind the Scenes to Protect Its Friends and Pad its Profits.

32.      Chase is an SBA-affiliated lender authorized to process loan requests for the PPP.

It is a highly sophisticated entity with a 220 year-long history, over 5,000 bank branches

nationwide, and over $2 trillion in assets—larger than the GDP of all but seven countries.

33.      Chase, like other SBA-approved lenders participating in the PPP, serves as the

intermediary and gatekeeper between putative borrowers and the SBA. No one can access the

PPP without going through Chase or another approved lender.

34.      Chase's primary business is not, however, the processing of loans for a federal

economic stimulus program. It operates in countless banking sectors, and has a diverse,

sophisticated clientele—some of whom it favors with perks, attention, and privileges more than

others, in order to maintain the substantial business (and occasionally prestige) they bring to the

table.

35.      As one of the nation's largest banking institutions, Chase knew that it would

receive tens of thousands of requests from putative PPP borrowers the minute that the window

opened for applications. (And it did, in fact, receive such a crush of requests.) It also knew, or at

least expected, that many of these requests would not be for extraordinarily large amounts of

money, by Chase's standards (*i.e.*, less than $50,000). It also knew that the $349 billion allocated

for the PPP would run dry before all meritorious applications could be processed—the scope of

---

[7]      *Id.* at 20816 § (3)(d); *see also* PAYCHECK PROTECTION PROGRAM (PPP)
INFORMATION SHEET,
https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.p
df.

COVID-19's impact on small businesses was far too great to be covered by even such a large

sum of money. (And the fund did, in fact, run dry very quickly.) Further, and importantly, Chase

knew that many of its current, favored, and larger customers would also want to receive PPP

loans, and would not appreciate having to wait in line with everyone else.

36.     As such, upon information and belief. Chase decided to dispense with the

requirement that loan applications be processed on a first-come, first-served basis to the extent

possible. Instead, it would make all efforts to prioritize processing the loan applications of its

favored customers first, and deal with the remainder later, if they ever managed to make it

through Defendant's failing website.

37.     According to the *New York Times*, that's exactly what happened.[8] For example,

"At Chase, the nation's largest bank, nearly all private and commercial banking clients who

applied for a small-business loan got one, whereas only one out of every 15 retail banking

customers who sought loans was successful. ... The two-tiered system paid off for well-to-do

customers: By the time the [PPP] ran out of money ... many top clients of national and regional

banks had already had their loans approved."

38.     Many customers trying to access Chase's online PPP loan application portal on

April 3 were, in fact, frustrated in their ability to apply. Again, per the *Times*: "At Chase, a portal

accepting preliminary requests to apply was only sporadically accessible on April 3, the first day

of the program. The best that customers could hope for was a call back from a Chase

representative — days later — to proceed with the next steps." (This jibes with Plaintiff's

---

[8]     Emily Flitter & Stacy Cowley, *Banks Gave Richest Clients 'Concierge Treatment' for Pandemic Aid*, N.Y. TIMES, https://www.nytimes.com/2020/04/22/business/sba-loans-ppp-coronavirus.html (Apr. 22, 2020).

experience, as discussed below, along with that of numerous other putative applicants who have
turned to the Internet to voice their frustrations with Chase.)

39.     The result was to be expected, with the biggest clients of Chase and its parent
company, JPMorgan, the victors: "At JPMorgan, nearly all of the 8,500 commercial and private
banking clients who applied for a loan got one. That included companies like the sandwich chain
Potbelly and the pharmaceutical company MannKind. At the same time, only 18,000 of more
than 300,000 small-business banking customers who applied through Chase's retail bank, where
they normally did business, got loans, according to the bank. In all, Chase handed out $14 billion
through the program — more than any other bank, but still less than half of the $36 billion that
customers had sought."

40.     Defendants Ruth's Chris experience was one of, if not the most, egregious
examples of the outcome of Defendant Chase's scheme. With more than $450 million in annual
revenue, 150 locations nationwide (including at least three in Illinois) and more than 5,700
employees, Ruth's Chris hardly seems like the "small business" Congress had in mind in passing
the CARES Act and PPP.

41.     Nevertheless, with Chase's assistance Ruth's Chris—through each of the named
Ruth's Chris Defendants—was able to obtain not one, but *two* $10 million PPP loans before
program funding ran out. (These loans would have earned Chase $200,000 in origination fees.)
This allowed Ruth's Chris to obtain twice the amount of PPP loans permitted for a single entity
under the SBA's Final Interim Rule, despite the fact that the two Ruth's Chris Defendants here
operate under the same corporate umbrella and have nearly identical names.

42.     To put this in context, the $20 million Ruth's Chris received could have instead
funded 25,000 loans to 800 actual small businesses (like and including Plaintiff's). Foregoing

the PPP loan would not have been a serious issue for these Defendants, as Ruth's Chris is not

truly a "small business", but is actually a well-heeled nationwide chain with access to numerous

funding sources outside of the PPP. Indeed, in the month prior to Defendants' applying for its

PPP loans Ruth's Chris's parent company drew down $56 million from existing lines of credit.[9]

Still the temptation of PPP funding was too strong to pass up.

43.     Ruth's Chris received its massive, generous loans—which again, may effectively

become grants if Ruth's Chris is able to meet certain basic requirements in spending the money it

receives—despite the fact that employees across its franchises have largely been laid off,

including its many servers, busboys, dishwaters, hosts, and the like. Whether many or *any* of the

5,000-plus hourly Ruth's Chris hourly employees will be brought back to work using this money

is genuinely an open question, given that "stay at home" orders remain in effect and social

distancing will continue to reduce (or eliminate) restaurant foot traffic in most Ruth's Chris

locations for the foreseeable future. And the company itself has said that it will only support

take-out and delivery options where "sales are sufficient to cover the costs of management

staffing those locations."

44.     As one observer noted, the potential for Ruth's Chris to abuse its PPP loan was

enormous:

> Cheryl J. Henry, the CEO of Ruth's Hospitality Group, was paid
> $6.1 million in total compensation in fiscal year 2018. Her base pay
> is $650,000, with the rest comprised of stock and bonuses. Ruth's
> Hospitality Group also continues to pay hundreds of thousands of
> dollars to its former CEO, Michael O'Donnell (base pay $500,000),
> its Chief Administrative Officer, Susan L. Mirdamadi (base pay
> $340,000), and its Chief Financial Officer, Arne G. Haak (base pay

---

[9]     Raul Shah, *Ruth's Hospitality Group: Which Cocktail To Order Is The Only Liquidity Concern*, SEEKING ALPHA, https://seekingalpha.com/article/4338174-ruths-hospitality-group-which-cocktail-to-order-is-only-liquidity-concern (Apr. 17, 2020).

$300,000). All of these executives are eligible for large bonuses and an "automobile allowance" of $700 to $1000 per month.

This is how Ruth's Hospitality Group can spend most of the $20 million on "payroll" while furloughing nearly all of its staff. Under the Payroll Protection Program, salary up to $100,000 counts toward the requirement that 75% of the forgivable loan is used to support payroll. But for a company like Ruth's Hospitality Group, they could meet that threshold, for example, with just 150 employees that make $100,000 and up.[10]

45.     This was, upon information and belief, the result Ruth's Chris was aiming for in working with Chase.

46.     Sunlight has proven to be partial disinfectant: in the face of immense public criticism, Ruth's Chris announced it would return the $20 million. But the damage was done. Hundreds of small businesses like and including Plaintiff missed an opportunity to receive their maximum potential PPP loans in a timely manner due to Ruth's Chris's (and Chase's) actions, and there is no guarantee that they ever will. Ruth's Chris's walk-back cannot undo the lost opportunities, lost time value of money, and unnecessary stress incurred by these small businesses and their owners.

47.     Likewise, Defendant Phunware—a company that was paid almost $3 million by President Trump's re-election campaign in 2019 alone—received a nearly $3 million loan through Defendant Chase, and did so with unusual speed. Defendant Phunware applied for its loans on April 8th, days after the PPP application process opened. While Plaintiff sat for hours furiously attempting to access Chase's website (and never could), Defendant Phunware received

---

[10]     Judd Legum, *A Raw Deal*, POPULAR INFO. https://popular.info/p/a-raw-deal (Apr. 20, 2020).

the white glove treatment from Chase: It's application was approved—and the company received its PPP funds—by April 10th, just two days after it applied.[11]

48. As with Ruth's Chris, getting a PPP loan was hardly Phunware's only option. The company has raised over $100 million since 2009, and currently works for the President's re-election campaign. It is a sophisticated entity that could have sought help elsewhere, but instead, chose to leverage its connections to cut the PPP application line.

49. Notably, on March 30, 2020—one day after the PPP program was passed by Congress—Defendant Phunware appointed a former JPMorgan Chase executive, Blythe Masters, to chair its corporate board.

50. To be sure, Chase's (and its clients') misconduct did not happen by accident: it was as part of a carefully executed plan by Chase. For example, upon information and belief, in the 24 hours prior to the April 3 window opening, leaders of Chase's retail bank hosted a nationwide conference call to provide workers with directions on how to handle customers, and to discourage branch employees from getting involved in customers' PPP loan applications. As a result, Chase's favored customers (as well as its parent company's favored customers) got the special treatment they desired.

51. Upon information and belief, Chase provided individualized support and service for a select group of PPP loan applicants that allowed them to "cut the line" and submit

---

[11] Stephen Gandel & Graham Kates, *Phunware, a data firm for Trump campaign, got millions in coronavirus small business help*, CBS NEWS
https://www.cbsnews.com/amp/news/phunware-data-collection-trump-campaign-coronavirus-small-business-loans/ (Apr. 23, 2020). While Phunware had 93 employees at the end of 2019, it has apparently furloughed over one-third of them in recent months. Thus, in order for Phunware to have its entire loan (plus one percent interest) forgiven as part of the PPP, it will have to rehire all of those employees and pay them for eight weeks according to the PPP's rules.

applications earlier than they otherwise would have been able to, but for Chase's intervention. Simultaneously, Chase discouraged and/or put stumbling blocks in front of otherwise qualified applicants who were not in Chase's orbit and favor. Consequently, qualified loan applicants (including Plaintiff) were not able to get in line for a PPP loan (via application) when they should have, delaying, diminishing, or losing their potential loan as a result.

52. The actual outcome of Chase-processed PPP loan applications supports this conclusion. (*See* **Figures 1 and 2.**) Figure 1 depicts the PPP loans Chase processed between April 3, 2020 (when the window to apply for loans opened) and April 13. Figure 2 depicts loans processed between April 13 and April 16.

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 725,058 | $37,178,984,187 | 70.05% | 15.02% |
| >$150K - $350K | 156,590 | $35,735,615,983 | 15.13% | 14.44% |
| >$350K - $1M | 102,473 | $59,291,602,643 | 9.90% | 23.95% |
| >$1M - $2M | 31,176 | $43,278,883,532 | 3.01% | 17.48% |
| >$2M - $5M | 16,516 | $49,288,997,593 | 1.60% | 19.91% |
| >$5M | 3,273 | $22,769,309,582 | 0.32% | 9.20% |

(**Figure 1**)

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 1,229,893 | $58,321,791,761 | 74.03% | 17.04% |
| >$150K - $350K | 224,061 | $50,926,354,675 | 13.49% | 14.88% |
| >$350K - $1M | 140,197 | $80,628,410,796 | 8.44% | 23.56% |
| >$1M - $2M | 41,238 | $57,187,983,464 | 2.48% | 16.71% |
| >$2M - $5M | 21,566 | $64,315,474,825 | 1.30% | 18.79% |
| >$5M | 4,412 | $30,897,983,582 | 0.27% | 9.03% |

(**Figure 2**)

53. The data shows that Chase processed loan applications for $150,000 or less at far faster clip during the final three days of the PPP loan fund's solvency. Upon information and belief, this is because Chase's favored customers tended to request far larger loan amounts, and Chase prioritized those loan applications during the opening 10 days of the application period.

54.    As of April 17, 2020, Chase had approved less than half of the total funding small businesses have applied for, with $26 billion in PPP loan applications outstanding.[12]

## FACTS SPECIFIC TO SHA-POPPIN

55.    Plaintiff Sha-Poppin is a gourmet popcorn maker and distributor based in Westchester, Illinois. Offering over "50+ fantastic flavors" (and the ability to customize up to 130), Sha-Poppin sells its popcorn to individuals and businesses across the country. It has enjoyed success and the support of its customers for over 20 years.

56.    Sha-Poppin employs five employees, including Sha-Poppin's founder and manager Stacy Hawkins-Armstrong and others who work at Sha-Poppin's brick-and-mortar location in Westchester.

57.    Illinois Governor J.B. Pritzker reacted swiftly to the threat of COVID-19, announcing a disaster proclamation for the state on March 10, 2020. Statewide school closures, limits on public gatherings, and limits on the operations of both "essential" and non-essential businesses followed soon thereafter.

58.    As a member of the food service industry, Sha-Poppin is deemed an "essential" business that is allowed to continue operating during the pandemic. Even so, in the past two months, Sha-Poppin has lost the majority of its business. While the company has generously stretched its limited resources to forestall laying off its employees, its financial resources were quickly depleting.

---

[12]    Hugh Son, *JPMorgan Says It Has $26 Billion In Small Business Relief Applications That Need Funding*, CNBC, https://www.cnbc.com/2020/04/17/jpmorgan-says-it-has-26-billion-in-small-business-applications-left.html (Apr. 17, 2020).

59.     The possibility of obtaining a PPP loan gave Sha-Poppin a ray of hope. And fortunately for Hawkins-Armstrong—or so she believed—Sha-Poppin already held a small-business account with a major SBA-approved lender at the time the program was enacted: Defendant Chase. Because Sha-Poppin was indisputably a putatively qualified PPP loan recipient under the SBA's regulations, given its size and Hawkins-Armstrong's plans to use the loan to primarily cover payroll costs and rent, so long as its application was submitted in a timely manner nothing should have stood in its way from obtaining the largest possible loan it needed.

60.     When the PPP loan application window opened on April 3, 2020, Hawkins-Armstrong diligently attempted to submit Sha-Poppin's application through Chase's online portal that very day. Chase's website, however, returned an error messages each time she attempted to submit her application, with instructions indicating that she should *not* call Chase customer service.

61.      For days thereafter, Hawkins-Armstrong attempted to submit Sha-Poppin's PPP loan application through Chase's online portal, and for days it would not work. These error messages provided no guidance about the "error" in question, when Chase's portal would be functional again, or how to seek assistance. To the contrary, the only direction Chase gave Hawkins-Armstrong was to *not* call Chase's customer service department.

62.     Many other small businesses across the country experienced this very same problem with Chase's web portal. Some customers were eventually able to get through, but only after many days of waiting and countless fruitless efforts that wasted their time—all while the remaining pot of PPP funds was rapidly shrinking.

63.     Hawkins-Armstrong was eventually told by Chase that it was too late to apply. Indeed, a bank employee eventually called her—before the deadline to submit PPP loan applications had even expired—to subtly suggest that she take her business elsewhere.

64.     This process took a severe emotional and physical toll on Hawkins-Armstrong. Attempting to navigate Chase's flawed application process with her employees' livelihoods (and her own) on the line caused Hawkins-Armstrong to break out in hives, requiring that she take steroids to stop the outbreak.

65.     Desperate, Hawkins-Armstrong turned to the small bank Seaway, a division of Self-Help Federal Credit Union, for assistance. But neither Hawkins-Armstrong nor Sha-Poppin had any prior relationship with Seaway. As such, Seaway—a smaller bank with less flexibility to offer larger loans to new clients—was only able to offer her a small $6,000 loan. Even though $6,000 would only provide enough capital keep Sha-Poppin for a fraction of the eight-week period envisioned by the SBA, Hawkins-Armstrong was desperate for a lifeline for the business and its employees. Thus, it accepted the offer from Seaway.

66.     Neither Hawkins-Armstrong nor anyone else at Sha-Poppin had any idea that the reason they were stonewalled by Chase Bank, prevented from applying for and receiving a PPP loan, and forced to work with a new bank who could only offer to help her apply for a much smaller loan (which amounted to only one-quarter of what she initially applied for through Chase), was that Chase Bank had made the decision, internally, to prioritize the submission of PPP applications for its bigger and longstanding business clients over small businesses like, Sha-Poppin.

67.     Tragically, Chase Bank's misconduct had another effect: Sha-Poppin's $6,000 loan will be all that she gets. Under the terms of the PPP, Sha-Poppin is now *disqualified* from

applying for any future funds Congress allocates to the program, including from the $310 billion of second round PPP funding set to be approved in late April 2020.

68.     Had Sha-Poppin been allowed to apply on a truly first-come, first-served basis with Chase, it would have received enough funds to keep paying its employees and pay the rent at its brick-and-mortar location for two months.

69.     Instead, as a result of Defendants' actions, Sha-Poppin is now at a severe risk of having to lay off its employees and shutter its business—the very result Congress sought to avoid in creating a first-come, first-served loan program to be deployed by SBA banking partners with all deliberate speed. At minimum, Sha-Poppin lost out on $19,000 in PPP loan funds it would have otherwise received, but for Defendants' misconduct.

## CLASS ACTION ALLEGATIONS

### Plaintiff Class Action Allegations

70.     **Class Definition**: Plaintiff Sha-Poppin brings this action for itself and on behalf of a class of similarly situated individuals, defined as follows:

> All Chase Business Banking account holders that met the criteria for receiving a loan under the PPP, applied for, or attempted to apply for, a PPP loan through Chase, and whose application was not processed on a first-come, first-served basis.

Further, Sha-Poppin brings this action for itself and on behalf of the following sub-class:

> **Illinois Subclass**: All Chase Business Banking account holders in Illinois that met the criteria for receiving a loan under the PPP, applied for, or attempted to apply for, a PPP loan through Chase, and whose application was not processed on a first-come, first-served basis.

The following people are excluded from the Class and Subclass (collectively "the Class" unless otherwise indicated): (1) any Judge or Magistrate presiding over this action and members of their families; (2) Chase, Chase's subsidiaries, parents, successors, predecessors,

and any entity in which the Chase or its parents have a controlling interest and its

current or former employees, officers, and directors; (3) persons who properly execute and file

a timely request for exclusion from the Class; (4) persons whose claims in this matter have

been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Chase's

counsel; and (6) the legal representatives, successors, and assigns of any such excluded

persons.

71.     **Numerosity**: The exact number of members of the Class is not available to

Plaintiff at this time, but it is clear that individual joinder is impracticable. Upon information and

belief, hundreds of individuals fall into the definition of the Class.

72.     **Commonality and Predominance**: There are many questions of law and fact

common to Plaintiff and the Class, and those questions predominate over any questions that may

affect individual members. Common questions for the Class include, but are not limited to, the

following:

(a)     Whether Chase was required to process applications for PPP loans
        on a first-come, first-served basis;

(b)     Whether Chase processed applications for PPP loans on a first-
        come, first-served basis;

(c)     Whether Chase's web portal for submitting PPP loans was set up
        to intentionally discourage applicants;

(d)     Whether Chase had a policy and/or practice of prioritizing existing
        and large business customers to the detriment of other PPP loan
        applicants;

(e)     Whether Chase's conduct as alleged herein constitutes negligence;

(f)     Whether Chase's conduct as alleged herein constitutes fraudulent
        concealment; and

(g)     Whether Plaintiff and the Class are entitled to equitable relief,
        including actual and compensatory damages, and other injunctive
        relief.

73.     **Typicality**: Plaintiff's claims are typical of those of members of the Class, as

Plaintiff and other members sustained injuries arising out of the same wrongful conduct of

Chase.

74.     **Adequate Representation**: Plaintiff will fairly and adequately represent the

interests of the Class and has retained counsel competent and experienced in complex litigation

and class actions. Plaintiff has no interests antagonistic to those of the Class, and Chase has no

defenses unique to Plaintiff.

75.     **Superiority**: Class proceedings are superior to all other available methods for the

fair and efficient adjudication of this controversy, as joinder of all members of the Class is

impracticable. Individual litigation would not be preferable to a class action because individual

litigation would increase the delay and expense to all parties due to the complex legal and factual

controversies presented in this Complaint. By contrast, a class action presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court. Economies of time, effort, and expense will be

fostered and uniformity of decisions will be ensured.

### Defendant Class Action Allegations

76.     **Class Definition**: Plaintiff Sha-Poppin sues Defendants RCSH Operations, LLC,

RCSH Operations, Inc., and Phunware, Inc., individually and as representatives of a class of

defendants under Rule 23(a), (b)(1), and (b)(3) of the Federal Rules of Civil Procuedure on

behalf of the following proposed class (hereafter the "Loan Recipient Defendant Class" or

"Defendant Class"):

> All Chase Commercial Banking account holders that applied for a
> PPP loan through Chase, and whose application was approved not on
> a first-come, first-served basis.

The following people are excluded from the Defendant Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Plaintiff, Plaintiff's subsidiaries, parents, successors, predecessors, and any entity in which the Plaintiff has a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

77.    **Numerosity**: The members of the Loan Recipient Defendant Class are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe, and on that basis allege, that over 1000 entities satisfy the definition of the Loan Recipient Defendant Class. The members of the Loan Recipient Defendant Class will be easily identified from Defendant Chase's records.

78.    **Typicality**: Plaintiff's claims against the members of the Loan Recipient Defendant Class are typical as to each member of the Loan Recipient Defendant Class. Each member is responsible to Plaintiff by virtue of the fact that the members received loans from Chase in a manner inconsistent with the required process and in a manner unfair to those that did not receive such loans.

79.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of the controversy as to the liability of the members of the Loan Recipient Defendant Class. The claims asserted against the Loan Recipient Defendant Class necessarily involve a single decision or set of decisions and turn on the same theory of liability.

80. **Adequacy**: The persons sued as representatives of the Loan Recipient Defendant Class are sophisticated commercial enterprises. Each is intimately familiar with Chase PPP loan process and will fairly and adequately protect the interests of the members of the Loan Recipient Defendant Class. The representatives of the Loan Recipient Defendant Class will be able to retain counsel experienced in representing corporate entities in complex class litigation. Plaintiff's claim against the representatives of the Loan Recipient Defendant Class and each other member of the Loan Recipient Defendant Class are the same; the representatives therefore have the same incentives to defend the suit and have adequate resources to defend it.

81. **Commonality**: There are many questions of law and fact common to the representatives of the Loan Recipient Defendant Class and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Loan Recipient Defendant Class include, but are not limited to, the following:

    (a) Whether Loan Recipient Defendant Class members received PPP loans in a manner inconsistent with the required "first-come first-served" process;

    (b) Whether Loan Recipient Defendant Class members were unjustly enriched by receiving preferential treatment from Chase; and

    (c) Whether Plaintiff and members of the Class were harmed by Defendant Chase's PPP loan approval process.

82. This case is maintainable as a Defendant Class Action under Fed. R. Civ. P. 23(b)(l) because prosecution of actions by or against individual members of the Loan Recipient Defendant Class would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for the Loan Recipient Defendant Class. Further, adjudication of the liability of some of the individual members of the Proposed Defendant Class in separate

actions or in this action would be dispositive of the interest of other individuals not Defendants in this action, thereby impeding their ability to protect their interests.

83. **Predominance:** Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Loan Recipient Defendant Class predominate over any questions affecting only individual members of the Loan Recipient Defendant Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Litigation of these claims in one forum is efficient. This litigation involves a single decision or set of decisions that affects the rights of thousands of persons who should have received, or received more, in PPP loans and the obligations of, on information and belief, more than 1,000 entities who are members of the Loan Recipient Defendant Class. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about the Defendants' individual obligations to Plaintiff.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(Individually and on Behalf of the Illinois Subclass as Against Defendant Chase)**

84. Plaintiff incorporates by reference the foregoing allegations.

85. Chase is the nation's largest banking entity and a major SBA-affiliated lender. As such, it owes a professional duty of care to those who use it to apply for SBA loans to process them in a manner consistent with the letter and spirit of the rules and regulations of the SBA loan programs. This is true both as to customers of its bank, such as Plaintiff, as well as non-customers seeking to become new customers.

86.     Chase was charged by the government with processing PPP loan applications on a

first-come, first-served basis, pursuant to a CARES Act regulations explicitly and implicitly

requiring this.

87.     Instead, Chase decided to process applications in a manner that would inherently

result in their not being processed in the order they were received—or as close to it as was

reasonably feasible—but would instead privilege, and create a "fast lane," for its favored

commercial clients.

88.     Such conduct breached the duty of care owed to PPP loan applicants, including

Plaintiff, to handle their loan application processing consistent with SBA regulations.

89.     As a direct and proximate result of Chase's professional negligence, Plaintiff and

the Class have incurred damages in the form of a lost or reduced value PPP loans, as well as the

lost time value of money Plaintiff and other members of the Class will likely incur future

damages caused by Chase's negligence.

90.     As such, Chase is the direct and proximate cause of Plaintiff and the putative

Class' injuries, and is liable to them for the full measure of damages allowed under applicable

law, as well as interest, reasonable attorneys' fees, expenses, and costs.

## SECOND CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
### (Individually and On Behalf of the Class as Against Defendant Chase)

91.     Plaintiff incorporates by reference the foregoing allegations.

92.     Defendant Chase understood prior to the formal launch of the PPP that it would

receive many thousands of applications as businesses rushed to the nation's largest bank to

obtain a loan. It also understood that the pot of money allocated by Congress to fund the PPP

loans would be inadequate to satisfy demand. As such, it undertook to push its favored

commercial clients into a fast lane for loan processing, delaying the processing of others' loans and at times discouraging applicants (even its own customers, such as Plaintiff) from applying.

93.     Chase did not reveal this to the public. Instead, it promoted itself as an SBA-affiliated lender willing and able to process PPP loan applications.

94.     By participating in an SBA loan program while concealing that it would not adhere to one of the program's most critical features—that loans would be processed in the order applications were received—it injured Plaintiff and the Class, who lost out on loans (or were forced to accept smaller loans to the extent they could be obtained) they would have otherwise received.

95.     Thus, Chase's concealed materials facts about how it would conduct its processing of PPP loan applications where it otherwise had a duty to speak, as a major lender, SBA-affiliated lender, and—in Plaintiff and much of the Class' case—an existing business partner. Had Chase been open and honest about its plans, Plaintiff and the Class could have applied elsewhere for a loan, and sought to work with an institution willing to follow the SBA's dictates for administration of the PPP.

96.     Chase's conduct, and its concealment of these material facts where there was a duty to speak, proximately caused Plaintiff's and the Class' injuries.

97.     As a result, Defendant is liable to Plaintiff and the Class for the full measure of damages allowed under applicable law.

### THIRD CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Individually and On Behalf of the Class Against Defendant Chase)

98.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

99.    The tort of tortious interference with prospective economic advantage has the following elements: (1) the plaintiff's reasonable expectation of entering into a valid business agreement; (2) the defendant's knowledge of the plaintiff's business expectancy; (3) the defendant's purposeful interference with the plaintiff's business expectancy; and (4) damages resulting from the defendant's interference. *See Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484, 693 N.E.2d 358, 370 (1998). A valid contract is not required to state a claim for tortious interference with prospective economic advantage. *See Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 862, 893 N.E.2d 981, 993 (2008).

100.    Here, Plaintiff and the putative Class reasonably expected to enter into a valid business agreement to receive a loan from SBA—one that was critical to their survival during the COVID-19 pandemic.

101.    Defendant Chase was aware of the expectancy, to the extent it received a PPP loan application from Plaintiff and the putative Class or otherwise had direct and specific knowledge that they intended to apply for a PPP loan.

102.    Defendant Chase  intentionally interfered in Plaintiff's and the putative Class' prospective business by allowing other PPP loan applicants to cut in front of them in the application line, and indeed, by systematically prioritizing larger and more prestigious commercial clients over Plaintiff and the putative class.

103.    As a proximate result of Chase's misconduct, Plaintiff and the putative class were not able to obtain PPP loans they otherwise were qualified to receive, or were only able to obtain much smaller loans elsewhere.

104.    As a result, Defendant Chase is liable to Plaintiff and the putative class for the full array of damages allowed under applicable law.

## FOURTH CAUSE OF ACTION
## UNFAIR AND DECEPTIVE BUSINESS PRACTICES, 815 ILCS 505/1, *et seq.*
## (Individually and On Behalf of the Illinois Subclass as Against Defendant Chase)

105.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

106.     The Illinois Consumer Fraud and Deceptive Business Practices Act provides, in relevant part, that in Illinois it is illegal to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact[.]" 815 ILCS 505/2. "Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." 815 ILCS 505/10a(a).

107.     Here, Chase operates throughout the State of Illinois, including in its capacity as an SBA-affiliated lending institution. In executing its role as an SBA lender involved in the PPP, Chase concealed, suppressed, and omitted mention of the fact that it was not processing PPP loan applications in the order in which they were received, and instead, was creating a "fast track" for its favored, privileged commercial clients. This was despite the fact that the program was designed to serve applicants on a first-come, first-served basis.

108.     Chase intended that businesses, like and including Plaintiff's and the putative Illinois Subclass', rely on this concealed material fact, for two reasons. First, Chase wanted to inhibit Plaintiff and the putative Illinois Subclass in obtaining PPP loans before their favored clients did. Second, Chase still wanted Plaintiff's and the putative Illinois Subclass' business (albeit not as much as its favored, privileged clients' business). Thus, Chase's concealment was a win-win for the company: it could curry the favor of its privileged, favored commercial clients

28

by processing their PPP applications quickly and diligently, and then, to the extent the PPP fund

had not yet run out, process everyone else's applications afterwards.

109.    Because of Chase's unfair conduct, and misleading and deceptive omissions and

concealment, Plaintiff and the Illinois Subclass applied, or attempted to apply, for PPP loans

through Chase under the impression that they would be processed on a first-come, first-served

basis consistent with federal law. Had Chase been honest about its intentions, Plaintiff and the

Illinois Subclass could and would have sought to apply for PPP loans elsewhere in the first

instance and been able to submit a successful application before the PPP loan fund ran dry.

110.    As a result, Chase violated the Illinois Consumer Fraud and Deceptive Business

Practices Act, and are liable to Plaintiff for damages caused by their deceptive conduct.

### FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (Individually and On Behalf of the Class as Against Defendant Chase)

111.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

112.    To state a claim for unjust enrichment, "a plaintiff must allege that the defendant

has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the

benefit violates the fundamental principles of justice, equity, and good conscience." *Gagnon v.

Schickel*, 2012 IL App (1st) 120645, ¶ 25, 983 N.E.2d 1044, 1052 (quoting *HPI Health Care

Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989)).

113.    Here, Chase has obtained and retained massive benefits to Plaintiff and the

putative Subclass' detriment, in the form of origination fees obtained from clients allowed to cut

in line to apply for PPP loans. It only obtained those fees by improperly and illegally prioritizing

its favored, privileged commercial clients' applications over Plaintiff's and the putative

Subclass'.

114.    Principles of justice equity, and good conscience demand that Chase not be allowed to retain these funds. Chase fell short in its duties as a lender, and an SBA-affiliated lender, during a crisis. What's more, Chase endeavored to use a crisis atmosphere and limited PPP funding to its advantage, shuffling its PPP loan applicants in a way most favorable to its goals of (a) ensuring the happiness of its favored clients, and (b) maximizing profits.

115.    The end result of Chase's conduct was that Plaintiff and the putative Subclass were unable to obtain the loans they desperately needed to keep their businesses afloat during the COVID-19 pandemic.

116.    As such, Chase must disgorge any and all origination fees it obtained from processing its favored clients' loans outside of Chase's normal PPP loan application process(es).

### SIXTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (Individually and On Behalf of the Class as Against Ruth's Chris, Phunware, and the Defendant Class)

117.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

118.    To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Gagnon*, 2012 IL App (1st) 120645, ¶ 25, 983 N.E.2d at 1052 (quoting *HPI Health Care Servs., Inc.*, 131 Ill. 2d at 160, 545 N.E.2d at 679).

119.    Ruth's Chris, Phunware, and the Loan Recipient Defendant Class has received the benefits of the PPP loan program to the exclusion of Plaintiff and the Class. Ruth's Chris, Phunware, and the Loan Recipient Defendant Class are Chase's largest and—to Chase—most profitable clients that were eligible to participate in the PPP. Chase permitted Ruth's Chris, Phunware, and the Loan Recipient Defendant Class to jump the line, allowing the Loan

Recipient Defendant Class to absorb virtually all of the available PPP loan program funds at the expense of Plaintiff and the Class.

120.     Ruth's Chris, Phunware, and the Loan Recipient Defendant Class knew and understood that they were being given preferential treatment by Chase (including because they were not being asked to apply through Chase's malfunctioning online portal), but did not reveal what was going on to others. Doing so might have forced them to wait in line with everyone else. Ruth's Chris, Phunware, and the Loan Recipient Defendant Class aided this effort by working directly with Chase, outside of the PPP loan application process for everyone else, to get their applications processed and submitted on a prioritized basis.

121.     Principles of justice equity, and good conscience demand that the Loan Recipient Defendant Class not be allowed to retain these funds. Aided and abetted by Chase, the Defendant Class obtained these benefits in violation of the "first-come first serve" policy in the PPP program. The Loan Recipient Defendant Class used their institutional clout to ensure that they would get funds from the PPP program that properly should have gone to earlier-applying members of the Plaintiff Subclass, even if it would mean that the Loan Recipient Defendant Class got less money.

122.     Plaintiff and the putative subclass have been harmed by the Loan Recipient Defendant Class' cutting to the front of the line: Plaintiff and the putative Subclass were unable to obtain the loans they desperately needed to keep their businesses afloat during the COVID-19 pandemic.

123.     As such, the Loan Recipient Defendant Class should be forced to disgorge the PPP loan funds that were received by Chase's processing its favored clients' loans outside of Chase's normal PPP loan application process(es).

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sha-Poppin Gourmet Popcorn LLC, individually and on behalf of the Class and Subclass, and the Defendant Class, respectfully requests that the Court enter an Order providing for the following relief:

A.      Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as representative of the Class, and appoint its counsel as Class Counsel;

B.      Declare that Defendant Chase's actions, as set out above, constitute negligence, fraudulent concealment, tortious interference with prospective economic advantage, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and unjust enrichment;

C.      Award all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and caused by Defendant Chase's conduct, including without limitation actual damages for past, present, and future expenses arising from Defendant Chase's misconduct, lost time and interest, and all other damages suffered, including any future damages likely to be incurred by Plaintiff and the Class;

D.      Declare that the Loan Recipient Defendant Class's actions, as set out above, constitute unjust enrichment;

E.      Award all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and caused by the Loan Recipient Defendant Class' unjust enrichment, including disgorgement of PPP loan funds improperly received;

D.      Award Plaintiff and the Class reasonable litigation expenses and attorneys' fees;

E.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of

Plaintiff and the Class; and

      G.     Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

                            Respectfully submitted,

                            **SHA-POPPIN GOURMET POPCORN LLC**,
individually and on behalf of all others similarly situated,

Dated: April 24, 2020             By: /s/Jay Edelson
                            *One of Plaintiff's Attorneys*

                            Jay Edelson
                            jedelson@edelson.com
                            Benjamin H. Richman
                            brichman@edelson.com
                            Christopher L. Dore
                            cdore@edelson.com
                            Ari J Scharg
                            ascharg@edelson.com
                            Daniel J. Schneider
                            dschneider@edelson.com
                            EDELSON PC
                            350 North LaSalle Street, 14th Floor
                            Chicago, Illinois 60654
                            Tel: 312.589.6370
                            Fax: 312.589.6378

                            *Counsel for Plaintiff and the Putative Class*